USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___8/8/18___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- against -

DONNELL MURRAY,

Defendant.

**MEMORANDUM
OPINION & ORDER**

16 Cr. 281 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Defendant Donnell Murray is charged with (1) RICO conspiracy, in violation of

18 U.S.C. § 1962(d); (2) attempted murder and conspiracy to commit murder in aid of

racketeering, in violation of 18 U.S.C. § 1959(a)(3) and (5); (3) narcotics conspiracy, in violation

of 21 U.S.C. § 846; and (4) use of a firearm in connection with these crimes, in violation of 18

U.S.C. § 924(c)(1)(A). (S1 Indictment (Dkt. No. 27) Counts One, Two, Four, and Five) Murray

has moved to suppress physical evidence recovered from his residence at 800 Isabelle Isle, Apt.

307, Dover, Delaware. (Mot. (Dkt. No. 149); Def. Post-Hearing Br. (Dkt. No. 255)) For the

reasons stated below, Murray's motion will be denied.

## BACKGROUND

### I. DEFENDANT'S AFFIDAVITS, THE SEARCH WARRANT, AND
### THE EVIDENCE RECOVERED FROM MURRAY'S APARTMENT

In support of his motion to suppress, Murray has submitted affidavits from Grace

Wright – his grandmother – and Destinee Ferguson – his fiancé. Both women were present at

Murray's residence when law enforcement agents arrived on January 4, 2017, with an arrest

warrant for Murray. (See Wright Aff. (Dkt. No. 151); Ferguson Aff. (Dkt. No. 152); Konoski

Aff., Ex. A (Search Warrant and Affidavit) (Dkt. No. 150-1)) The affidavits set forth the

following version of events:

On January 4, 2017 – at approximately 6:00 a.m. – Federal Bureau of Investigation agents arrived at Murray's residence. (Wright Aff. (Dkt. No. 151) ¶¶ 3-6; Ferguson Aff. (Dkt. No. 152) ¶¶ 3-6, 8) Wright answered the door. (Wright Aff. (Dkt. No. 151) ¶¶ 4-5) The agents advised Wright that they had an arrest warrant for Murray, and they asked if he was inside the apartment. (Id. ¶¶ 7-8) Wright told the officers that she "did not know" if Murray was home, and called out for Ferguson, Murray's fiancé. (Wright Aff. (Dkt. No. 151) ¶ 7; Ferguson Aff. (Dkt. No. 152) ¶¶ 2-4) Ferguson woke up, walked out of a bedroom, and observed agents entering the apartment with their guns drawn. (Ferguson Aff. (Dkt. No. 152) ¶ 5) Agents informed Ferguson that they had an arrest warrant for Murray and asked where Murray was. (Ferguson Aff. (Dkt. No. 152) ¶¶ 5, 7-8) Ferguson told the agents that Murray "was not in the apartment." (Id. ¶ 7) According to Wright and Ferguson, neither gave the agents permission to enter or search the residence. (Id. ¶ 11; Wright Aff. (Dkt. No. 151) ¶¶ 8-9)

Wright observed agents "go through all the rooms of the apartment," including Murray's bedroom. (Wright Aff. (Dkt. No. 151) ¶ 9) Both Wright and Ferguson observed agents search the closet in Murray's bedroom. (Id.; Ferguson Aff. (Dkt. No. 152) ¶ 9) Agents were "moving and searching through items that were on the top of the closet, as well as items on the bottom of the closet." (Ferguson Aff. (Dkt. No. 152) ¶ 10)

Wright states that after the agents searched Murray's bedroom, they showed her "small plastic glassine envelopes" that they had found, and asked her if she "knew what they were and what they were used for." (Wright Aff. (Dkt. No. 151) ¶ 10)

The agents then stated that "they would obtain a search warrant," and several agents left to obtain a warrant. (Id. ¶ 11; Ferguson Aff. (Dkt. No. 152) ¶ 12) At about 3:00 p.m.,

2

the agents returned, stating that they had a search warrant. (Ferguson Aff. (Dkt. No. 152) ¶ 12; Wright Aff. (Dkt. No. 151) ¶ 12)

The search warrant authorized agents to search Murray's residence for

[m]arijuana, any other controlled substances, scales, and packaging equipment/materials, any drug paraphernalia, any and all firearms and/or ammunition, United States Currency (USC, Money), business records and or documents indicative of drug transactions . . . and or USC transactions, any electronic communication devices, photographs of USC and/or physical evidence of illegal drug use and or sales; described in the annexed affidavit and application or complaint. . . .

(Konoski Aff., Ex. A (Search Warrant and Affidavit) (Dkt. No. 150-1) at 2)

The affidavit submitted in support of the search warrant application asserts that there is probable cause to believe that Murray's residence contains the items listed above based on: "a strong, distinct odor of marijuana" inside Murray and Ferguson's bedroom; a black and red cap bearing the logo "G5 lifestyle" – which the agents believed was evidence of Murray's "affiliation with the Blood Hound Brims" gang; a small brown box "known to unit members to be commonly used to contain heroin and/or packaging materials through [thei]r training, knowledge, and experience"; a black digital scale and "clear plastic bags used in the packaging/sale of illegal drugs lying on the floor of [Murray's] closet" in plain view; Ferguson's admission that she had just smoked marijuana and that the apartment contained a quantity of marijuana; and the fact that Murray had been charged with possession of controlled substances, including marijuana, a week earlier. (Id. at 6)

After obtaining the search warrant, agents searched the entire apartment (Wright Aff. (Dkt. No. 151) ¶ 12; Ferguson Aff. (Dkt. No. 152) ¶ 12), completing their search at about 5:00 p.m. (Wright Aff. (Dkt. No. 151) ¶ 14)

Agents recovered the following items, inter alia, from their search of Murray's residence: (1) a cardboard "box of packaging baggies, spoon, [and] heroin" found on a shelf in

3

Murray's closet; (2) a cap bearing the logo "G5 Lifestyle," also found on the closet shelf; (3) a digital scale, found in Murray's closet; (4) drug "packaging materials" – including glassine envelopes and a bag of green baggies – and heroin, found in Murray's closet; (5) three cell phones and "two bags of capsules," found in Murray's closet; and (6) a marijuana cigarette, found in the bathroom. (Konoski Aff., Ex. A (Search Warrant and Affidavit) (Dkt. No. 150-1) at 8)[1]

## II. SUPPRESSION HEARING

On February 14, 2018, this Court conducted an evidentiary hearing concerning Murray's suppression motion. The Government called FBI Special Agent Christopher Lake, FBI Special Agent Shawn Haney, and Wilmington, Delaware Police Department Detective Steve Barnes. (See Feb. 14, 2018 Hearing Tr. (Dkt. No. 321) at 2-3, 36-37, 58-59) Grace Wright and Destinee Ferguson testified on behalf of Murray. (See id. at 76-77, 92)

### A. Government Witnesses

On January 4, 2017, a team of approximately nine law enforcement officers – including Agent Lake, Agent Haney, and Detective Barnes – arrived at Murray's residence with a warrant for his arrest. (Id. at 2-5, 36-39, 58-60) Agent Lake has been an FBI agent since 2014, and is assigned to the FBI's Violent Crime Safe Streets Task Force (the "Task Force") in Delaware. (Id. at 3-4) Agent Lake acted as the lead agent on January 4th. (Id. at 4, 39) Agent Haney has worked for the FBI for sixteen years, and is also assigned to the Task Force. (Id. at

---

[1] The Government also seized court documents, "lease paperwork", credit cards, and two Illinois driver's licenses. (See Konoski Aff., Ex. A (Search Warrant and Affidavit) (Dkt. No. 150-1) at 8) The Government concedes that the seizure of these items "exceeded the scope of the warrant," and states that it will "not seek to introduce [these] items in its case in chief." (Govt. Br. (Dkt. No. 192) at 43 n. 13) Accordingly, these items are not in dispute for purposes of Murray's motion to suppress.

4

37) Detective Barnes has been a member of the Wilmington, Delaware Police Department for more than eleven years, and is likewise assigned to the Task Force. (Id. at 59)

Agent Lake testified that the Task Force was asked to locate and apprehend Murray, for whom there was an outstanding arrest warrant. (Id. at 5) Attached to the request – apparently from the FBI's New York field office – was an arrest warrant for Murray, his photograph, his criminal history, a copy of his New York driver's license, and information regarding the charges against Murray. (Id. at 6) Murray's New York driver's license listed his address as 800 Isabelle Isle, Apt. 307, Dover, Delaware. (Id.) The agents were also aware that – a week earlier – Murray had been arrested in Claymont, Delaware, and had provided 800 Isabelle Isle as his address. (Id. at 6-7)

At about 6:00 a.m. on January 4, 2017, agents went to 800 Isabelle Isle to execute the arrest warrant for Murray. (Id. at 6-12) The agents approached Apartment 307 from a narrow exterior stairwell; they formed a single line up the stairs. (Id. at 9) Agent Lake was "towards the front" of the line (id.), while Agent Haney and Detective Barnes were in the middle of the line. (Id. at 41, 62)

Agent Lake testified that one of the other agents knocked on the door, and that Special Agent Bole spoke with the woman who answered the door. (Id. at 10-12) According to Agent Lake, Agent Bole explained that the agents had an arrest warrant for Murray, and was told that Murray was "not at the location." (Id. at 11)

Agent Lake further testified that Agent Bole asked one of the women if the agents could enter the apartment and look around, and she consented. (Id.) Agent Haney testified that

he was too far away from the door to hear the conversation, but that he was told by other agents that consent had been obtained.[2]  (Id. at 42)

Agent Lake, Agent Haney, and Detective Barnes all testified that they smelled marijuana when they first entered the apartment.  (Id. at 15, 43, 71)  Agents Haney and Lake testified that Agent Bole spoke with Ferguson about the smell of marijuana in the apartment, and that Ferguson told Agent Bole that she had recently smoked marijuana and that there was marijuana in the apartment.  (Id. at 16, 52)

The agents then conducted a "protective sweep" of the apartment, which involve[d] "looking for bodies, people, and making sure that the [residence was] . . . safe."  (Id. at 57, 63, 75)  The agents testified that in order to "clear" the apartment, they looked in "places that people could hide" – such as "open spaces, closets, bathrooms, behind large pieces of furniture, [and] underneath beds."  (Id. at 16, 44, 63)

During the protective sweep, the agents looked inside a walk-in closet in Murray's bedroom.  (Id. at 17, 32, 45)  Agent Haney and Detective Barnes testified that they observed a distinctive small cardboard box and a red and black baseball cap – bearing the logo "G5 Lifestyle" – on a shelf inside the closet.  (Id. at 17-18, 24, 65)  Agent Haney and Detective Barnes also observed a black digital scale on top of a suitcase on the floor of the closet.  (Id. at 48-49, 69)  Agent Haney and Detective Barnes testified that such digital scales are "commonly used to weigh [drug] product[s] before packaging them for sale."  (Id. at 49, 69)  Agent Haney and Detective Barnes testified that they did not have to move anything inside the closet in order to see the small cardboard box, the G5 Lifestyle cap, or the digital scale.  (Id. at 23-24, 46, 48)

---

[2]  Agent Bole – the agent who allegedly obtained consent – did not testify at the suppression hearing.

6

Both Agent Haney and Detective Barnes further testified that – based on their experience in conducting narcotics investigations – they immediately recognized the small cardboard box as containing drug paraphernalia. Detective Barnes testified that he had seen the same type of small cardboard box in at least ten other narcotics investigations, and that in each instance the cardboard box had contained heroin glassines.[3] (Id. at 65-66) Agent Haney likewise testified that he had observed the same type of small cardboard box on at least twenty prior occasions while executing arrest and search warrants in narcotics investigations, and that on each occasion the cardboard box had contained heroin glassines. (See id. at 47-48, 52-53, 58)

When Agent Haney saw the small cardboard box he noticed that the top of the box was ajar, and he tipped open the lid of the box to confirm that it contained glassines. (Id. at 51, 57-58) He then lowered the lid. (Id. at 51)

As to the red and black G5 Lifestyle cap, Detective Barnes and Agent Haney testified that the cap was "consistent with [what] a member of [the] Bloods street gang would wear," because of its color. (Id. at 50, 65, 68; GX 18 (Photograph of G5 Lifestyle Hat)) Detective Haney testified that members of the Bloods street gang are known to wear red clothing. (Feb. 14, 2018 Hearing Tr. (Dkt. No. 321) at 50) Detective Barnes likewise testified that Murray's possession of the black and red cap was significant because it appeared to be custom-made, the writing on it was unique, and "the colors were indicative of the Bloods gang." (Id. at 68) After observing the cap, Detective Barnes Googled the phrase "G5 Lifestyle" and

---

[3] Glassines are small wax paper envelopes – generally stamped with a brand – that are used to package heroin for sale. (Id. at 46-47, 53, 58, 66) Detective Barnes testified that – based on his training and experience – heroin glassines are usually packaged in small plastic Ziploc bags. (Id. at 66)

found a link to an indictment concerning the Blood Hound Brims gang, of which Murray is allegedly a member. (Id. at 68; see also S1 Indictment (Dkt. No. 27))

Agent Lake further testified that agents observed a marijuana cigarette in a bowl on the counter of the bathroom sink. (Feb. 14, 2018 Hearing Tr. (Dkt. No. 321) at 17-18, 24; GX 15 (Photograph of Marijuana Cigarette))

Based on the odor of marijuana inside the residence, Ferguson's statement that she had just smoked marijuana and that there was marijuana in the apartment, the G5 Lifestyle hat – which the agents believed to be indicative of gang affiliation – the cardboard box of glassines, and the digital scale, the agents decided to obtain a search warrant for the apartment. (Feb. 14, 2018 Hearing Tr. (Dkt. No. 321) at 19-20, 52, 70-71) Agent Lake testified that the agents obtained a search warrant at some point in the afternoon, and then conducted a full search of the residence. (Id. at 22)

During that search, Agent Lake took photographs inside the apartment and kept a log of the evidence that was recovered. (Id.) Agents recovered, among other things: the cardboard box described above – which contained packaging baggies and heroin (id. at 72; GX 19 (Photograph of Interior of Cardboard Box)); a shoebox containing two plastic baggies of clear empty capsules[4] (Feb. 14, 2018 Hearing Tr. (Dkt. No. 321) at 72-73; GX 22 (Photograph of Interior of Shoebox)); three cell phones and paperwork bearing Murray's name (Feb. 14, 2018 Hearing Tr. (Dkt. No. 321) at 72-73); green plastic baggies, which are commonly used to distribute marijuana (id. at 74:12-21; GX (Photograph of Green Plastic Baggies)); the marijuana

---

[4] Detective Barnes testified that such capsules are commonly used to distribute heroin. (Feb. 14, 2018 Hearing Tr. (Dkt. No. 321) at 74)

cigarette previously discovered in the bathroom (Feb. 14, 2018 Hearing Tr. (Dkt. No. 321) at 24-25); the G5 Lifestyle cap; and the digital scale. (Id. at 72)

## B. Defense Witnesses

Wright testified that on January 4, 2017 – at about 6:00 a.m. – she heard loud banging and talking at the door, and someone said "[t]his is the police." (Id. at 78) Wright opened the door, and the agents said that they were looking for Murray. (Id. at 79) In response, Wright told the officers she did not know whether Murray was in the apartment. (Id.) Wright then called out to Ferguson. (Id. at 78, 93) Ferguson woke up, walked out of the bedroom, and observed officers inside the house. (Id. at 94) Ferguson testified that the officers asked her where Murray was, and that she told them she "didn't know." (Id.) Both Ferguson and Wright testified that they did not give the officers permission to enter or search the apartment. (Id. at 79, 94, 96)

The officers then conducted a search of the apartment, which included Murray's bedroom. (Id. at 80, 94) Ferguson testified that she was present when the agents entered Murray's bedroom, and that she observed one of the agents enter the bathroom, and another enter the closet and "rummage" through Murray's belongings with a flashlight. (Id. at 95) Ferguson testified that while she could not see the closet shelf from where she was sitting, she could hear the agent "moving things around" in the closet and observed him "looking [at] and opening" bags on the closet floor. (Id.)

Ferguson acknowledged that, at some point, agents discovered a marijuana cigarette in the bathroom. (Id. at 97) Ferguson testified that the agents did not ask her about the marijuana, or if she had recently smoked marijuana. (Id. at 97-98)

Wright testified that – at some point during the search – the officers directed her attention to Murray's bedroom. (Id. at 80) Wright testified that the agents took the cardboard box out of the closet, opened it, and spread what appeared to be cellophane papers and plastic baggies out in front of her on a table in the bedroom. (Id. at 80-82) Wright later testified, however, that the agents spread the cellophane papers and plastic baggies out on the cardboard box itself, which she described as two to three feet wide. (Id. at 81-82) A photograph of the cardboard box introduced by the Government shows that the box is only a few inches wide. (See GX 17 (Photograph of Cardboard Box)) When shown a photograph of the cardboard box and asked whether that was the box that she had observed, Wright testified that she suffers from retinal disease, and could not identify anything in the photograph. (Feb. 14, 2018 Hearing Tr. (Dkt. No. 321) at 83)

The agents then informed Wright and Ferguson that they were going to obtain a search warrant. (Id. at 86-87) At about 3:00 p.m., the agents returned with a search warrant, and conducted a more thorough search of the apartment. (Id. at 87, 97) The agents completed the search at about 5:00 p.m. (Id. at 87, 98)

## DISCUSSION

Murray has moved to suppress all physical evidence recovered during the January 4, 2017 search of his residence. (Mot. (Dkt. No. 149); Def. Post-Hearing Br. (Dkt. No. 255)) As an initial matter, Murray argues that all of this evidence must be suppressed because the agents were not authorized to enter Murray's apartment, and therefore all of the evidence seized is the product of an illegal search. (Def. Post-Hearing Br. (Dkt. No. 255) at 6) Murray also contends that (1) the "G5 Lifestyle" cap must be suppressed, because it falls outside the scope of the search warrant; and (2) the cardboard box containing the heroin glassines must be suppressed,

10

because Agent Haney tipped open the lid of the box prior to obtaining a search warrant.[5] (Id. at 10-15)

The Government responds that the agents' entry into Murray's apartment was justified, because they had an arrest warrant and a reasonable belief that Murray was inside the apartment. (Govt. Post-Hearing Br. (Dkt. No. 260) at 10-14) The Government further contends that the seizure of the G5 Lifestyle cap was appropriate under the "plain view" doctrine, and that the cardboard box containing the heroin glassines is admissible under the inevitable discovery doctrine. (Id. at 15-22)

## I. ENTRY INTO MURRAY'S APARTMENT

### A. Applicable Law

"[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 603 (1980). "[W]here 'there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that [the suspect's] arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law.'" United States v. Lovelock, 170 F.3d 339, 343 (2d Cir. 1999) (alteration in original) (quoting Payton, 445 U.S. at 602-03). Accordingly, "the police [generally] do not need a search warrant to enter a suspect's home when they have an

---

[5] Murray does not separately challenge the agents' seizure of the digital scale, the three cellphones, the marijuana cigarette, the plastic baggies, or the two bags of capsules. (See Def. Post-Hearing Br. (Dkt. No. 255); Konoski Aff., Ex. A (Search Warrant and Affidavit) (Dkt. No. 150-1) at 8) In any event, all of these items plainly fall within the scope of the search warrant. (See Konoski Aff., Ex. A (Search Warrant and Affidavit) (Dkt. No. 150-1) at 2 (authorizing seizure of "[m]arijuana, any other controlled substances, scales, and packaging equipment/materials, any drug paraphernalia, any and all firearms and/or ammunition, United States Currency (USC, Money), business records and or documents indicative of drug transactions . . . and or USC transactions, any electronic communication devices. . . . ")).

arrest warrant for the suspect." United States v. Lauter, 57 F.3d 212, 214 (2d Cir. 1995).

To determine whether an officer's entry into a person's residence is authorized pursuant to an arrest warrant, the "proper inquiry is whether there is a reasonable belief that the suspect resides at the place to be entered to execute [the] arrest warrant, and whether the officers have reason to believe that the suspect is present" under the totality of the circumstances. Lovelock, 170 F.3d at 343 (alteration in original) (quoting Lauter, 57 F.3d at 215). The "reasonable belief" test is less stringent than – and requires less justification than – the probable cause test. See Lauter, 57 F.3d at 215. Indeed, law enforcement officers need not "conduct a thorough investigation to obtain evidence of an arrestee's actual presence before entering his residence," United States v. Terry, 702 F.2d 299, 319 (2d Cir. 1983), "[n]or need the officers' belief [that the suspect is present], if reasonable, be correct." Lovelock, 170 F.3d at 343. "If the circumstances are such that a reasonable person would doubt a given representation [as to a suspect's residence], the officers cannot reasonably act upon that representation without further inquiry, but the constitutional requirement is that they have a basis for a reasonable belief as to the operative facts, not that they acquire all available information or that those facts exist." Id. at 344 (citations omitted).

**B.    Analysis**

Murray argues that all of the evidence recovered from his residence on January 4, 2017 must be suppressed as fruit of the poisonous tree, because (1) the agents did not have a reasonable belief that Murray was inside the apartment; and (2) they did not have consent to enter the apartment. (Def. Post-Hearing Br. (Dkt. No. 255) at 6) According to Murray, because the agents were not authorized to enter the apartment, the evidence discovered inside the apartment is the product of an illegal search. (Id.) The Government responds that the agents

lawfully entered Murray's residence in order to execute the arrest warrant. (Govt. Post-Hearing
Br. (Dkt. No. 260) at 11-15)

The Court concludes that the agents had a reasonable belief that Murray was
present in the apartment, and were therefore authorized to enter the apartment in order to execute
the arrest warrant. As an initial matter, the agents were aware that on December 28, 2016 –
seven days earlier – Murray was arrested in Clayton, Delaware, on a narcotics charge, and had
provided 800 Isabelle Isle, Dover, Delaware as his address. (See Feb. 14, 2018 Hearing Tr. (Dkt.
No. 321) at 6-7; Govt. Br., Ex. A (Police Report) (Dkt. No. 192-1) at 2-4) The agents were also
aware that Murray's New York driver's license listed 800 Isabelle Ave, Apt. 307, Dover,
Delaware as his address. (See Feb. 14, 2018 Hearing Tr. (Dkt. No. 321) at 6; Govt. Br., Ex. B
(Police Report) (Dkt. No. 192-1) at 7) Given these facts, the agents had ample grounds to
believe that Murray resided in that location on January 4, 2017.

Murray argues, however, that the agents did not have a reasonable belief that he
was inside the residence at the time of entry, because Ferguson told the officers that Murray was
not in the apartment and there was no outward sign of his presence. (See Def. Post-Hearing Br.
(Dkt. No. 255) at 8; Def. Reply (Dkt. No. 274) at 2; Ferguson Aff. (Dkt. No. 152) ¶ 7))

The agents were not required to take Ferguson at her word, however. In addition
to the driver's license and very recent arrest record indicating that Murray resided at the
apartment, when Wright answered the door, she stated that she "did not know" whether Murray
was home – suggesting that he did in fact reside at this location. (See Feb. 14, 2018 Hearing Tr.
(Dkt. No. 321) at 79; Wright Aff. (Dkt. No. 151) ¶ 7)

In any event, "only the most naive police officer would accept [Ferguson's denial]
at face value," because – as his fiancé – Ferguson had an incentive to lie to protect Murray. See

Harper v. Leahy, No. 16 Civ. 4178 (BMC), 2017 WL 2371163, at *4 (E.D.N.Y. May 31, 2017) (holding that officers had reasonable belief that suspect was on the premises because court records indicated it was his residence, the suspect's mother answered the door and stated that he was not at home, "confirming that he did in fact live there," and databases indicated that suspect resided at the location). Indeed, Agent Haney testified that during his sixteen-year FBI career, interested witnesses have frequently falsely stated that a suspect is not on the premises when the individual is actually on the premises. (Feb. 14, 2018 Hearing Tr. (Dkt. No. 321) at 37, 42) The Court concludes that – under the totality of the circumstances – the agents had a reasonable belief that Murray was present at the Isabelle Isle residence, and were entitled to enter his apartment to execute the arrest warrant.

## II. WHETHER THE AGENTS EXCEEDED THE PROPER BOUNDS OF A PROTECTIVE SWEEP

### A. Applicable Law

"When arresting a person in a residence, officers may perform a protective sweep incident to the arrest to protect themselves or others." Lauter, 57 F.3d at 216. Officers have a legitimate interest "in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." Maryland v. Buie, 494 U.S. 325, 333 (1990). Accordingly, "as an incident to [an] arrest . . . officers [can], as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id. at 334; Terry, 702 F.2d at 319 ("Once lawfully in the apartment the agents were entitled to make a limited security check of the premises."). The scope of a "protective sweep" must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding," and "lasts no longer than is

necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Buie, 494 U.S. at 327, 335-36.

"Patently incriminating evidence that is in plain view during a proper[ly conducted] security check may be seized without a warrant." United States v. Kiyuyung, 171 F.3d 78, 83 (2d Cir. 1999); see also United States v. Babilonia, 854 F.3d 163, 180 (2d Cir. 2017) ("When an officer, during a justified intrusion, encounters incriminating evidence, '[t]he [plain view] doctrine serves to supplement the prior justification – whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused – and permits the warrantless seizure.'" (quoting Horton v. California, 496 U.S. 128, 135-36 (1990))). The "plain view" doctrine authorizes an officer to seize an object without a warrant where (1) the "'police are lawfully in a position from which they view an object,'" (2) "'its incriminating character is immediately apparent,'" and (3) "'the officers have a lawful right of access to the object.'" United States v. Delva, 858 F.3d 135, 149 (2d Cir. 2017) (quoting Minnesota v. Dickerson, 508 U.S. 366, 375 (1993)).

For an item's incriminating nature to be "immediately apparent," police must have "probable cause to believe that an object in plain view is contraband without conducting some further search of the object." Dickerson, 508 U.S. at 375. It "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief,' that certain items may be contraband or stolen property or useful as evidence of a crime; . . . [a] 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." Texas v. Brown, 460 U.S. 730, 742 (1983). In making this determination, a court should consider the experience and judgment of the officer. See id. at 746 ("[W]e have recognized that a law

enforcement officer may rely on his training and experience to draw inferences and make deductions that might well elude an untrained person."). The purpose of the "immediately apparent" requirement is to ensure that the plain view doctrine is not "used to extend a general exploratory search from one object to another until something incriminating at last emerges." Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971).

### B. Analysis

#### 1. The G5 Lifestyle Cap

Murray contends that the G5 Lifestyle cap must be suppressed because the search warrant does not authorize seizure of items that "appear to be indicative of gang affiliation," and therefore the cap's seizure falls outside the scope of the search warrant. (Def. Post-Hearing Br. (Dkt. No. 255) at 10)  The Government responds that – even if the search warrant did not contemplate seizure of the G5 Lifestyle cap – it was discovered pursuant to a lawfully conducted protective sweep and properly seized under the plain view doctrine. (Govt. Post-Hearing Br. (Dkt. No. 260) at 17)  For the reasons explained below, this Court agrees.

As an initial matter, this Court concludes that the agents were "lawfully in a position from which they could view," and had a "lawful right of access" to, the closet in Murray's bedroom. See Delva, 858 F.3d at 149.  As discussed above, the agents had a reasonable belief that Murray was inside the apartment, and were accordingly authorized to enter the premises in an attempt to execute the arrest warrant for Murray.  Moreover, because the agents had a reasonable belief that Murray was inside the apartment, they "had the right, based on the authority of the arrest warrant, to search anywhere in the house that [Murray] might have been found" or "from which an attack could immediately be launched." See Buie, 494 U.S. at 330, 334.

Agent Lake, Agent Haney, and Detective Barnes all testified that the agents conducted a protective sweep of the apartment in an attempt to locate Murray, and ensure that there were no other individuals hiding in the apartment who might pose a threat. (Feb. 14, 2018 Hearing Tr. (Dkt. No. 321) at 16, 44, 63) Agent Haney and Detective Barnes further testified that, in performing the security sweep, agents looked "[a]nywhere a person could hide," including "under a mattress, under a bed, in a closet . . . underneath clothes that are on the floor, furniture, and even in a bathtub." (Id. at 44, 63)

Upon entering Murray's walk-in closet, the agents observed the G5 Lifestyle cap and the cardboard box of glassines in plain view on the closet shelf. (See id. at 17-18, 24, 46, 48-49, 65)[6] A number of agents then secured the premises, while others left to obtain a search warrant. (See id. at 20, 53, 85-86) After obtaining the search warrant, the agents then seized, inter alia, the G5 Lifestyle cap. (See id. at 71-72) The Court concludes that the G5 Lifestyle cap was discovered in plain view pursuant to a lawful protective sweep of Murray's walk-in closet. See Lauter, 57 F.3d at 217 (The officer was "justified in looking in the space between the bed and the wall, as a person certainly could have been hiding in that location.")

Murray argues, however, that the plain view doctrine does not apply to the G5 Lifestyle cap, because the incriminating nature of the cap was not immediately apparent. (Def. Post-Hearing Reply (Dkt. No. 274) at 3) It is axiomatic, however, that an officer need only have probable cause to believe "that certain items may be contraband . . . or useful as evidence of a

---

[6] To the extent that Ferguson asserts that the agents "rummage[d]" through Murray's belongings in the closet, or opened bags on the closet floor (see id. at 95), this Court accepts – as more credible – the agents' testimony that the digital scale, the G5 Lifestyle cap, and the cardboard box were all in plain view inside the closet. (See id. at 17-18, 24, 46-49, 65-66) Ferguson conceded in her testimony that she could not see – from where she was sitting – the closet shelf from which the agents recovered the cap and the cardboard box of glassines. (Id. at 95)

17

crime," and officers "may rely on [their] training and experience to draw inferences and make deductions that might well elude an untrained person." Brown, 460 U.S. at 742.

Here, the record demonstrates that the incriminating nature of the G5 Lifestyle cap was immediately apparent to the agents based on their training, experience, and familiarity with the Bloods street gang. Indeed, Agent Haney testified that he believed that the G5 Lifestyle cap had evidentiary significance because it was "consistent with [what] a member of [the] Bloods street gang would wear." (Feb. 14, 2018 Hearing Tr. (Dkt. No. 321) at 50) Agent Haney explained that the cap was red, and that members of the Bloods street gang are known to wear red clothing to signal their affiliation with the gang. (Id.) Detective Barnes similarly testified that the cap was of evidentiary significance because it appeared to be custom-made, the writing on it was unique, and "the colors were indicative of the Bloods gang." (Id. at 68)[7] (Id.) The Court concludes that the agents had "probable cause to believe that the [G5 Lifestyle cap] . . . constitute[d] evidence" of gang affiliation, and that the incriminating nature of the cap was immediately apparent to the agents based on their training and experience. See Babilonia, 854 F.3d at 18.

Because the agents "lawfully entered [the] premises in connection with an arrest, and in the course of making a permissible quick and limited protective sweep of the premises they [observed] an object whose incriminating character [wa]s immediately apparent, . . . they

---

[7] Detective Barnes also testified that he Googled the phrase "G5 Lifestyle" and that the search results included an indictment in Bronx County related to the Blood Hound Brims (see id. at 68), of which Murray is alleged to be a member. (See S1 Indictment (Dkt. No. 27)) Murray contends that he performed a Google search of "G5 Lifestyle," and that his search revealed no connection to any such indictment. (See Def. Reply, Ex. A (Google Search Results for G5 Lifestyle) (Dkt. No. 274) at 5-13) A Google search of "G5 bloods" yields the state court indictment cited by Detective Barnes, however. Accordingly, "G5" appears to have an association with the Blood Hound Brims.

[were entitled to] seize it without a warrant." See Delva, 858 F.3d at 149. Murray's motion to suppress the G5 Lifestyle cap will be denied.

### 2. Cardboard Box and Glassine Envelopes

Agent Haney testified that – during the protective sweep – he observed a small cardboard box in Murray's closet in plain view. Agent Haney recognized the cardboard box as a container for heroin glassines. Agent Haney lifted the lid of the cardboard box – which was ajar – and peered inside, and confirmed that it contained glassine envelopes. (Feb. 14, 2018 Hearing Tr. (Dkt. No. 321) at 51, 57) Murray contends that Agent Haney – in lifting open the lid of the box – "effectively performed a warrantless search," and that therefore the contents of the cardboard box must be suppressed. (Def. Post-Hearing Br. (Dkt. No. 255) at 15) The Government responds that even assuming arguendo that it was improper for Agent Haney to lift open the lid of the cardboard box, the heroin glassines should not be suppressed, because the inevitable discovery doctrine is applicable. (Govt. Post-Hearing Br. (Dkt. No. 260) at 19-20)

#### a. Inevitable Discovery Doctrine

"To 'safeguard Fourth Amendment rights generally,'" the Supreme Court has crafted the exclusionary rule, requiring the exclusion of evidence '[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights.'" United States v. Stokes, 733 F.3d 438, 443 (2d Cir. 2013) (citations omitted). "The core rationale" for the exclusionary rule is that it "is needed to deter police from violations of constitutional and statutory protections," and to prevent the prosecution from benefitting from unlawful police conduct. Nix v. Williams, 467 U.S. 431, 442-43 (1984).

The inevitable discovery doctrine constitutes an exception to the exclusionary rule. Stokes, 733 F.3d at 443. Under this doctrine, evidence obtained in violation of the Fourth

Amendment will not be suppressed where "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." Nix, 467 U.S. at 444; Stokes, 733 F.3d at 444 (inevitable discovery doctrine "provides that the fruits of an illegal search or seizure are nevertheless admissible at trial 'if the government can prove that the evidence would have been obtained inevitably without the constitutional violation'" (citations omitted)).[8] "The government bears the burden of proving inevitable discovery by a preponderance of the evidence." Stokes, 733 F.3d at 444 (citing Nix, 467 U.S. at 444; United States v. Cabassa, 62 F.3d 470, 472-73 (2d Cir. 1995)).

"'[P]roof of inevitable discovery 'involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment.'"" Stokes, 733 F.3d at 444 (quoting United States v. Eng, 971 F.2d 854, 859 (2d Cir. 1992)) (emphasis in Eng). District courts must "'determine, viewing affairs as they existed at the instant before the unlawful search occurred, what would have happened had the unlawful search never occurred.'" Id. "Evidence should not be admitted . . . unless a court 'can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor.'" Id. (quoting United States v. Heath, 455 F.3d 52, 55 (2d Cir. 2006)).

---

[8] The logic of this exception to the exclusionary rule is that excluding evidence that would have inevitably been discovered "would put the police in a worse position than they would have been in absent any error or violation[,] . . . because the police would have obtained that evidence [even] if no misconduct had taken place." Nix, 467 U.S. at 444. "In these circumstances, the societal costs of the exclusionary rule far outweigh any possible benefits to deterrence." Id. at 446.

## b. **Analysis**

Here, the record demonstrates that the cardboard box and the heroin glassines it contained would have inevitably been seized pursuant to a valid search warrant even if Agent Haney had not looked inside the box.

As discussed above, the agents lawfully entered Murray's apartment to execute an arrest warrant, and were authorized to conduct a protective sweep of the premises. While engaged in a lawful protective sweep, agents observed evidence and circumstances – which are set forth in the search warrant affidavit – that provided ample probable cause for the issuance of the search warrant. The evidence and circumstances included: "a strong distinct odor of marijuana" emanating from the bedroom shared by Ferguson and Murray; Ferguson's admission that she had just smoked marijuana and that the apartment contained an additional quantity of marijuana; a black digital scale commonly used for weighing narcotics, seized while in plain view; clear plastic bags commonly used to package narcotics, also in plain view; a distinctive cardboard box known by the agents to contain heroin glassines, also in plain view; and a red and black cap indicative of affiliation with the Bloods gang, also in plain view. (See Konoski Aff., Ex. A (Search Warrant and Affidavit) (Dkt. No. 150-1) at 6); Feb. 14, 2018 Hearing Tr. (Dkt. No. 321) at 15, 17-18, 23-24, 43, 46-49, 52-53, 58, 65-66, 69, 71) Accordingly, the search warrant obtained by the agents is valid.[9] See, e.g., United States v. Jenkins, 452 F.3d 207, 211, 214 (2d Cir. 2006) (odor of marijuana provided an "independent basis" for probable cause);

---

[9] The search warrant affidavit does not rely on Agent Haney's observation of heroin glassines inside the cardboard box. (See Konoski Aff., Ex. A (Search Warrant and Affidavit) (Dkt. No. 150-1) at 6) Accordingly, Agent Haney's opening of the cardboard box does not affect the validity of the search warrant.

21

United States v. Colon, No. 10 Crim. 498 (RPP), 2011 WL 569874, at *12 (S.D.N.Y. Feb. 8, 2011) (same)

Because the Government has established by a preponderance of the evidence that the cardboard box and the heroin glassines would have inevitably been seized pursuant to the valid search warrant obtained by the agents, Murray's motion to suppress this evidence will be denied.

## CONCLUSION

There being no basis to suppress the evidence seized, Murray's motion to suppress is denied. The Clerk of the Court will terminate the motion (Dkt. No. 149).

Dated: New York, New York
     August 8, 2018

SO ORDERED.

Paul G. Gardephe
United States District Judge

22