UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x

UNITED STATES OF AMERICA

    -against-                            Dkt #:  16-CR-281

DONNELL MURRAY,

                         Defendant.

--------------------------------------------------------------------x

# **SENTENCING MEMORANDUM**

BRYAN KONOSKI
Treyvus & Konoski, P.C.
*Attorney(s) for the Defendant*
305 Broadway, 14th Floor
New York, NY 10007
(212) 897-5832
Fax: (718) 668-1094
Email: bkonoski@aol.com

# I.

## OBJECTIONS TO THE PSR

**Offense Conduct:**

1. **Para 25, which states "Murray is considered an organizer or leader of the racketeering enterprise and its activities, which involved five or more participants or was otherwise extensive".**

The defense objects to the assertion that Mr. Murray was an organizer or leader of the Racketeering Enterprise, and objects to any sentencing guideline enhancement for his purported leadership role (see argument below).

Michael Adams testified that Donnell Murray had no position in the Bloodhound Brims at one point in time. (TR. P. 179, L. 4). Mr. Adams also testified that Mr. Murray never appeared in any of the gang paperwork that demonstrated leadership positions. Moreover, Mr. Adams testified that he only saw Mr. Murray a couple of times, but not that often, and that he had no significant connection to Mr. Murray. Michael Adams further testified that communication within the gang was important, and that he did not speak with Mr. Murray on the phone, did not have his phone number, did not have any real connection with Mr. Murray, was not friends with Mr. Murray on social media, and never received any orders or instructions from Mr. Murray. (TR. P. 660-661).

Thomas Morton testified that he (Mr. Morton) was a "high" (a high-ranking leader) within the gang. (TR. P. 1258, L. 24). However, when he first met Mr. Murray, Mr. Murray was introduced simply as a hound. (TR. P. 861, L. 10-20). Mr. Morton testified that he thinks Mr. Murray held the "low", which was a high-ranking leadership position. When Mr. Morton testified about Mr. Murray's alleged leadership role, he qualified his testimony by saying "I <u>think</u> he had the low, <u>if I'm not mistaken</u>." Mr. Morton said that Mr. Murray's rank went up,

or down, <u>but he wasn't sure</u>. (TR. P. 862, L. 1-10). Mr. Morton's testimony regarding Mr. Murray's purported leadership rank was not persuasive or compelling and undermines the argument that Mr. Murray was an organizer or leader of the enterprise.

Additionally, Mr. Morton testified that communication within the gang is important, that leadership positions are contained on the gang paperwork, that the gang paperwork had the names of leadership so that everyone knows who the leaders are, and that keeping in contact by phone and social media is important. (TR. P. 1259-1260). However, as discussed above, Mr. Murray did not appear on any of the gang paperwork and, therefore, was not specified as a leader of the gang.

Mr. Morton testified that everyone in the gang was supposed to be at Pow-Wows. If someone did not attend a Pow-Wow, there could be repercussions, such as being kicked out of the gang, assaulted, or could be required to pay additional fines. (TR. P. 822, L. 14-18 and P. 1263). As an example of repercussions for not showing up, Michael Adams testified that O-Dogg was physically attacked for not showing up to a universal pow-wow. (TR. P. 549, L. 6-8). However, over time, Mr. Adams saw Mr. Murray less and less and did not really see him at pow-wows. (TR. P. 662, L. 18-24). There was no proof and evidence at trial that Mr. Murray suffered any repercussions whatsoever for not attending pow-wows as required. This undermines the assertion that Mr. Murray held a high-ranking leadership position within the gang.

Kenneth Moore testified that Mr. Murray was the Acting God Father at one point in time. While the Acting God Father, Mr. Murray discussed a robbery that would take place. Mr. Moore was ordered by Mr. Murray to ride in the car with the guns. Mr. Moore refused to participate in the robbery and informed Mr. Murray that he would not assist in the robbery. Although Mr. Moore refused Mr. Murray's orders – at a time that Mr. Murray was allegedly the Acting Godfather – Mr. Moore suffered no repercussions. He was not beaten or shot at, he did not lose rank, he was not

kicked out of the gang, he was not reprimanded, and nothing happened to him at all. (TR. P. 2213-2215). However, Manuel Rosario testified that if a high-ranking member of the gang gave an order, you were supposed to carry out the order. If a gang member refused to carry out the order, it was expected that there would be repercussions such as being beaten, kicked out of the gang, or other discipline. (TR. P. 3064). The assertion that Mr. Murray held high rank within the gang is undermined by the mere fact that Mr. Moore suffered no repercussions whatsoever for not complying with the his orders when he allegedly issued those orders as the Acting God Father.

The Defense opposes any finding by the Court that Mr. Murray was an organizer or leader of the enterprise. Based on the aforementioned discussion, there is insufficient proof that he held a leadership position within the gang.

**Additional Relevant Conduct:**

2. **Para 27, which addresses 2011 Robbery of Drug Customers.**

The defense opposes the consideration of this allegation as additional relevant conduct on the basis that Mr. Murray was not convicted of any Robbery charges. See Page 2 of the Verdict Sheet.

3. **Para 29, which addresses the Proposed 2013 Robbery.**

The defense opposes the consideration of this allegation as additional relevant conduct on the basis that Mr. Murray was not convicted of any Robbery charges. See Page 2 of the Verdict Sheet.

**4. Para 30, which addresses the January 2012 Assaults at Club Heat.**

The defense objects to the consideration of this allegation as additional relevant conduct. Although there was proof at trial that Mr. Murray was present at Club Heat, there was no proof introduced at trial that that Mr. Murray personally engaged in any violent conduct at Club Heat. There is also no proof that he acted in concert with respect to any violent conduct at the club.

**5. Para 32, which addresses an assault of Mr. Wilson near the Chicken restaurant, and alleges that Mr. Murray possessed a firearm during the assault.**

The defense objects to the consideration of this allegation as additional relevant conduct on the basis that there was conflicting proof at trial as to whether Mr. Murray possessed a firearm on that day. Derrell Wilson, who was the victim of the assault, testified that he did not see anyone, including Mr. Murray, with a gun.

Derrell Wilson, who was the victim of the assault, testified that three people were present at the time of the assault. The three people were Latique Johnson, Donnell Murray, and a third unknown individual. Latique Johnson and the unknown individual gestured as if they had a gun. Derrell Wilson did not testify that Mr. Murray made any such gesture. However, Mr. Wilson testified that on the day of this incident he did not see a gun. (TR. P. 1359, Ln. 7-11).

Moreover, after the fight that occurred near the chicken-spot, Mr. Wilson saw Mr. Murray on the street. The two spoke, and Mr. Murray apologized to Mr. Wilson. He explained that Latique Johnson was drunk and that there was nothing he (Mr. Murray) could do to stop the assault. Mr. Murray expressed that he did not want any more violence between Mr. Wilson and Latique Johnson. (TR. P. 1362, Ln. 1-24 and 1552, Ln. 12-19).

6. **Para 35 to 38, which addresses Mr. Murray's responsibility of an extensive amount of narcotics.**

The defense objects to the consideration of these allegation as additional relevant conduct on the basis that the alleged drug weights, in total, amount to drug weights that would invoke 21 USC § 841 (b)(1)(A). However, Mr. Murray was convicted Conspiracy to Distribute Narcotics totaling less than 500 grams of cocaine, less than 28 grams of cocaine base, less than 100 grams of heroin, and a quantity of marijuana. The drug weights for which Mr. Murray was convicted invokes 21 USC § 841 (b)(1)(C), which has no applicable mandatory minimum sentence. See Page 7 of the Verdict Sheet.

## Victim Impact:

7. **Para 47, which addresses $123,600 in damages to the Kennedy Fried Chicken Restaurant business.**

The defense objects to the consideration of this allegation and the alleged losses as restitution since there is inadequate documented proof of the total actual financial losses.

## Offense Level Computation:

8. **Count 1A, Racketeering Conspiracy and 2011 Robbery of Drug Customers (Para 57-64).**

The defense objects to this calculation in its entirety because Mr. Murray was not convicted of any Robberies. See Page 2 of the Verdict Sheet.

9. **Count 2, Assault with intent to Commit Murder, January 2012 Chicken Restaurant Shooting, Victim 1 (Para 65-70).**

Paragraph 64 of the PSR adds a four-point enhancement because "the victim was shot multiple times and sustained life-threatening bodily injury".

The defense objects to the four-point enhancement under Paragraph 64. There was no testimony or medical evidence at trial that anyone actually sustained gunshot wounds or sustained "life threatening injuries".

The defense also objects to the Adjusted Offense Level under Paragraph 70 as this total should be 33, not 37, when taking into account the objection discussed above.

**10. Count 4, Conspiracy to Distribute Controlled Substances (Para 69-74).**

Objection to the weight calculation. The PSR uses a base offense level of 30 based on a converted drug weight of 2999.88 kg. However, Mr. Murray was convicted of much lower drug quantities. See Page 7 of the Verdict Sheet. Based on the drug quantities Mr. Murray was convicted of, the Converted Drug Weight should be 295 kg, as calculated below. Moreover, his Base Offense Level and Adjusted Base Offense Level should be 24; not 30 as set forth in the PSR at Paragraph 69 and 74. See USSG § 2D1.1(c)(8).

| Drug Name | Drug Quantity | Converted Drug Weight |
|---|---|---|
| Cocaine Base "Crack" | Less than 500 grams (Use 499 grams for calculation) | 27.0 |
| Cocaine | Less than 28 grams (Use 27 grams for calculation) | 99.8 |
| Heroin | Less than 100 grams (Use 99 grams for calculation) | 99.0 |
| **Total** | | **295 kg** |

**11. Multiple Count Adjustment (Para 75).**

Objection to the Multiple Count Adjustment as set forth below. The defense asserts that the Adjusted Offense Level is incorrect. However, it is acknowledged that the total number of units remains unchanged.

| Group/Count | Adjusted Offense Level | Units |
|---|---|---|
| Count 1A | 0 | 0.0 |
| Count 2 | 33 | 1.0 |
| Count 4 | 24 | .5 |

**12. Grater of the Adjusted Offense Levels (Para 76).**

The PSR calculates the greatest offense level at 37. However, the Defense Objects to this Adjusted Offense Level. The Defense asserts that the appropriate offense level is 33, as per the discussion above.

**13. Combined Adjusted Offense Level (Para 78).**

The PSR calculates the Combined Adjusted Offense Level as 38, with the inclusion of the increase in offense level discussed in Paragraph 77 (based on number of units assigned in the table in Paragraph 75). However, the Defense Objects to this Combined Adjusted Offense Level. The Defense asserts that the appropriate offense level is 34, as per the discussion above.

**14. Adjustment for Role in the Offense (Para 79).**

The Defendant objects to a four-point enhancement for allegedly being an organizer or leader of a criminal activity that involved five or more participants. The Defense asserts that no role adjustment should apply. See Page 1 of this memorandum.

**15. Total Offense Level (Para 82).**

The PSR calculates a Total Offense Level of 42. However, the Defense Objects to the Total Offense Level. The Defense asserts that the appropriate offense level is 34, as per the discussion above.

**<u>Criminal History Computation:</u>**

The Defendant objects to the total criminal history score of four, which establishes a criminal history category of III. The four-points are calculated based upon the following:

(1) A conviction for Grand Larceny, for which he was resentenced to Time Served on June 16, 2000. Mr. Murray committed this offense as a juvenile, at the age of 16. The PSR adds 1 point for this conviction. Presumably, this point was added on the basis that Mr. Murray was resentenced on this case within 5-years of the instant offense, since the indictment alleges that the Racketeering conspiracy began from at least the year 2005. See USSG §§ 4A1.1(c) and 4A1.2. **<u>The Defense objects to the addition of this point</u>**.

(2) A conviction for Criminal Sale of a Controlled Substance in the Fourth Degree, which he committed on March 8, 2003, and which he sentenced to probation. Mr. Murray was 23 years old at the time he committed this offense. Mr. Murray was discharged from Probation on March 2, 2012. The PSR adds 1 point for this conviction, presumably since the conviction was after he turned 18 years old, and the sentence was imposed within 10-years of the instant offense. See USSG §§ 4A1.1. The Defense does <u>not</u> object to the addition of this point since Mr. Murray was convicted of Count 2, which alleged an incident on January 28, 2012, which occurred within 10-years of the 2003 conviction.

(3) The PSR adds two additional points because Mr. Murray was on probation at the time he committed the instant offense. USSG §§ 4A1.1(d). The Defense does <u>not</u> object to these additional points.

The aforementioned objection by the Defense is made on the basis that there is insufficient proof that Mr. Murray was an active member of the charged Conspiracies and that he committed any of the alleged crimes in the year 2005, or within 5-years of the Grand Larceny conviction. Since there is insufficient proof that Mr. Murray was part of the alleged Conspiracies or that he committed any of the charged crimes within the requisite time period, the Court should not add this additional point to the Criminal History Calculation.

When removing this additional point, Mr. Murray is left with 3-points as part of the calculation. This places Mr. Murray within a Criminal History Category II.

In addition to the foregoing, the Defendant objects to the Court's consideration at sentencing of any of the "pending charges" in Paragraph 90, or "other arrests" in Paragraphs 91 through 111, since, as the PSR acknowledges, "there is no known court or disposition information for these cases". See PSR Paragraph 92. Since there is no proof that Mr. Murray was convicted of any of these alleged crimes, the Court should not take any of these matters into consideration at sentencing.

## II.

## THE DEFENDANT'S SENTENCING GUIDELINE CALCULATION
## POST-TRIAL

The Defendant, Donnell Murray, will be sentenced pursuant to his conviction after trial of Counts 1 (Racketeering Conspiracy), 2 (Assault and Attempted Murder in Aid of Racketeering), 4 (Conspiracy to Distribute Controlled Substances), and 5 (Possession of a Firearm).

Although Mr. Murray was convicted of Count 5 (Possession of a Firearm), there is currently a post-trial motion pending seeking dismissal of this charge pursuant to the United States Supreme Court decision in *United States v. Davis*, 139 S. Ct 2319 (2019).

According to the PSR, Mr. Murray's Total Offense Level is 42. (<u>See</u> PSR Paragraph 82). However, as per the Defendant's objections above, the Defense asserts that the Total Offense Level should be 34.

Additionally, according to the PSR, Mr. Murray's Criminal History Category is III. The Defense objects to this Criminal History Category and asserts that Mr. Murray falls within a Criminal History Category II.

Based on the calculation set forth in the PSR, which is a Total Offense Level of 42 and a Criminal History Category of III, the guideline imprisonment range is 360 months to Life.

However, if the Court accepts the Defendant's objections to the PSR, and objections to the sentencing calculation in the PSR, then the Total Offense Level would be 34, with a Criminal History Category of II, which would yield a guideline imprisonment range of 168 to 210 months.

Originally, the charges for which Mr. Murray was convicted included a conviction on Count 5 (Possession of a Firearm). In the past, a conviction on Count 5 would have resulted in "a 10-year term of imprisonment, which shall be imposed consecutively to any other term of imprisonment . . .." (See Unrevised PSR at Paragraph 135). However, the Defense asserts that this Count should be dismissed pursuant to *United States v. Davis*, 139 S. Ct 2319 (2019). If the Court dismisses Count 5, which it appears the Court is required to do as a mater of law, then the Defendant cannot be subjected to the mandatory minimum sentence associated with this count.

Upon the dismissal of Count 5, Mr. Murray will not be subjected to any mandatory minimum sentence.

It is requested that the Court find that the applicable sentencing guideline range is 168-210 months imprisonment. This is based upon a Total Offense Level of 34 and a Criminal History Category II.

Based on the discussion below, the Defense also asks the Court to grant a downward variance from the applicable sentencing guidelines.

## III.

### A SENTENCE OF 60-MONTHS' IMPRISONMENT IS APPROPRIATE DUE TO THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT. (18 U.S.C. § 3553(a)(l)).

Congress has directed sentencing courts to consider "the history and characteristics" of the defendant when imposing sentence. 18 U.S.C. § 3553(a)(l).

There is certainly no doubt that when someone commits a crime in our society, there are repercussions. Nothing in this memorandum to the court should be interpreted as undermining the seriousness of the offenses that Mr. Murray was convicted of committing. However, based on the fact that Mr. Murray was convicted of crimes that do not carry any mandatory minimum sentencing (assuming Count 5 is Dismissed), coupled with my communications with Mr. Murray, his family, the content of the PSR, and the content of the attached Exhibits, I believe that leniency by this Honorable Court is justified in this case. Specifically, I am asking this Honorable Court to sentence Mr. Murray to <u>60-Months' Imprisonment</u>. When fully considering "the history and characteristics" of the defendant, in addition to all other factors discussed in this memorandum, a sentence of 60-Months' is the appropriate sentence.

**A. Mr. Murray reports that he has had a relatively stable upbringing, has future aspirations, and wishes to reunite with his family, which demonstrates that he will positively reintegrate back into society once his sentence is complete.**

Mr. Murray was born on August 28, 1979, in Bronx, NY, to the consensual relationship of Duane Vivez and Darlene Murray.

Mr. Murray last had contact with his father in 2015. He commented that they have always had a distant relationship, and generally had contact only once per year as he was a child. His mother and father dissolved their relationship when he was just a baby. As a result, he also has four paternal half-siblings, who he is not in contact with. However, he has a maternal half-brother, Jemell Raymond, that he is close with. Jemell Raymond is currently incarcerated in New York State for unknown charges.

Although Mr. Murray's relationship with his father has been distant through the years, he reports that his other family relationships were strong and supportive. For instance, he has had a good relationship with his mother, Darlene, and his brother, Jemell. Although he wished to have his father present in his life, his maternal grandfather fulfilled the role of a father figure. Mr. Murray reports that during his formative years, his grandparents played a role in raising him and assisting his mother financially with the children's needs. Mr. Murray and his mother also resided with his grandparents for a period of time when he was young.

As a child, Mr. Murray was provided with adequate food and clothing, and a stable residence. He disclaimed having suffered from any abuse. Mr. Murray's grandfather died in 1996 from cancer; and, sadly, his grandmother died in 2018 from unknown medical conditions, while the defendant was in custody for the present case.[1] Mr. Murray was unable to attend her funeral and say his last goodbye to her.

Mr. Murray was never married, but he was engaged to Destinee Ferguson, age 33. He has a 7-year old son with Ms. Ferguson, who he loves very much. Ms. Ferguson and their son currently reside in Dover, DE. Prior to Mr. Murray's arrest, he also resided with his fiancée and his son in Dover, DE.

---

[1] As the Court will recall, prior to her passing, Mr. Murray's grandmother testified at a suppression hearing in this case.

Mr. Murray's mother, Darlene Murray, was interviewed by Probation. During the interview Ms. Murray stated that her son, Donnell Murray, was a good student and had a "wonderful childhood." Ms. Murray described Mr. Murray as an "intellectual and positive person," who has the support and love of his family members and his fiancée and son. She expressed concern that her family is breaking apart due to Mr. Murray's conviction in this case.

Mr. Murray has aspirations that he would like to achieve in the future, such as reuniting with his family, marrying his fiancée, engaging in gainful employment, attending film school, and being a productive member of the community.

Mr. Murray's upbringing and stable childhood, and his future aspirations to reintegrate positively back into society, are factors that the Court should take into consideration. When taking this information into consideration, in addition to the other contents of this sentencing submission, the Court should sentence Mr. Murray to 60-Months' Imprisonment.

*(The information in this section is supported by information in the PSR Paragraphs 113 to 119).*

**B. <u>Mr. Murray has family support and the role in his family's lives is a basis for the Court to grant a variance.</u>**

Mr. Murray has support from family and friends. This is demonstrated by the following Character letters, which are attached to this sentencing submission. (<u>See</u> Exhibit A).

- Darlene Murray

- Destinee Ferguson

- N. Kevin Lawrence

- Kyra McNulty

- Prof. Bebe Howell

Mr. Murray reported that his mother is "hurting" over his legal case and incarceration. (See PSR Paragraph 113). Darlene Murray also expressed that Mr. Murray has the love and support of his family members and his fiancée and son. She expressed concern that Mr. Murray's conviction is breaking up their family. (See PSR Paragraph 119). Mr. Murray's role in his family's lives – particularly in the life of his fiancée, his 7-year old son, and his mother -- is relevant pursuant to USSG § 5Hl.6. Although the policy statement of USSG § 5H1.6 generally discourages departures based on family ties, they are still a relevant area of inquiry and have been found to be persuasive for a variance in other cases. For instance, in *United States v. Owens*, 145 F .3d 923 (7th Cir. 1998), the Court found that a departure from 169 to 120 months under § 5Hl.6 was justified for defendant who maintained good relationship with his children and court believed his active role raising and supporting his family was atypical for a crack dealer. In *United States v. Crawford*, 2007 WL 2436746 (E.D. Wis. Aug. 22, 2007), the district court granted a variance from the Guidelines due to the defendant's family situation with five children and the impact incarceration would have on the children. In *Crawford*, the court sentenced the defendant to time served and placed her on four years' probation.

Based upon the guidance provided for in *United States v. Owens* and *United States v. Crawford*, the Court in this case is free to consider Ms. Calle's family ties and the impact that her incarceration will have on her family as a basis for a variance.

**C. Mr. Murray does not report any Mental or Emotional Health concerns, which the Court should consider in granting a variance.**

Mr. Murray disclaims that he suffers from any mental health or emotional conditions. (See PSR Paragraph 123). The Defense is unaware of any treatment or counseling for any Mental Health conditions.

Because Mr. Murray does not suffer from any mental or emotional health conditions, the Court should consider this in determining that Mr. Murray has a lower risk of recidivism. Consequently, the Court should grant Mr. Murray a variance.

**D. <u>Mr. Murray does not report a substance abuse problem, which the Court should consider in granting a variance.</u>**

Mr. Murray disclaimed any significant drug or alcohol usage, and disclaimed addiction to substances. (See PSR Paragraphs 125 to 128). Moreover, he reported that he is not in need of substance abuse treatment and believes that he can abstain from drug use while in the community. (See PSR Paragraph 128).

In some cases, when a defendant has a history of drug usage, and is amenable to future drug treatment, a downward variance may be justified. *See United States v. Nastri*, 633 F.App'x 57, 59 (2d Cir. 2016)("[I]t is well within a district court's discretion to determine whether addiction is the cause for leniency or merely an indication that he will 'persist [ ] in a life of reckless, criminal, dangerous, destructive, [and] deceitful conduct.'")(*quoting United States v. Douglas*, 713 F.3d 694, 703 (2d Cir. 2013); *see also*, *United States v. Walker*, No. 2:13-CR-379, 2017 WL 2198194, at *16 (D. Utah May 18, 2017)("While [t]he initial decision to take drugs is mostly voluntary . . . when drug abuse takes over, a person's ability to exert self-control can become seriously impaired. . . . Stated plainly, addiction biologically robs drug abusers of their judgment, causing them to act impulsively and ignore the future consequences of their actions; *United States v. Hendrickson*, 25 F.Supp.3d 1166, 1172-73 (N.D. Iowa 2014)("By physically hijacking the brain, addiction diminishes the addict's capacity to evaluate and control his or her behaviors. Rather than rationally assessing the costs of their actions, addicts are prone to act impulsively without accurately weighing future consequences. This is certainly true for Hendrickson, whose criminal

history coincides with, and directly relates to, periods of drug abuse"); *but see* U.S.S.G. § 5H1.4 ("Drug . . . dependence or abuse ordinarily is not a reason for a downward departure. Substance abuse is highly correlated to an increase in propensity to commit crime.").

However, contrary to the cases above, in this case, the Court should consider that Mr. Murray's judgment will not be impaired in the future by drug usage and that drug treatment is not necessary for him. Thus, the Court should consider the fact that Mr. Murray has a significantly reduced risk of recidivism since there is no proof he will be using narcotics in the future. This is a factor the Court should consider in granting a variance.

**E. Mr. Murray has participated in training courses while incarcerated.**

According to the PSR, Mr. Murray completed the following Courses while he was in custody: health education (2017 and 2018), anger management (2017), and card making (2018). This is a factor the Court should take into consideration when deciding an appropriate sentence in this case. (See PSR Paragraphs 14 and 134). Mr. Murray also reports that he is one of the head chefs in the kitchen at MCC.

**III.**

**A SENTENCE OF 60-MONTHS' IMPRISONMENT IS APPROPRIATE DUE TO THE NATURE AND CIRCUMSTANCES OF THE OFFENSE. (18 U.S.C. § 3553(a)(l)).**

Amongst the most important sentencing factors for a court to consider are the "nature and circumstances of the offense." 18 U.S.C. § 3553(a)(l). As an initial matter, it is important to note that the defendant is not downplaying the seriousness of the offense of conviction in this case. Mr. Murray was found guilty at trial of numerous very serious crimes.

However, it is important for the Court to consider that the Jury found numerous allegations against Mr. Murray were not proven, or were not as severe as alleged by the Government, including:

- Mr. Murray's involvement in Racketeering and his alleged agreement to commit Attempted Murder or Conspiracy to Commit Murder: Not proven. (See Verdict Sheet, Page 2).

- Mr. Murray's involvement in Racketeering and his alleged agreement to commit Robbery, Attempted Robbery, or Conspiracy to Commit Robbery: Not proven. (See Verdict Sheet, Page 2).

- Mr. Murray's involvement in Racketeering and his alleged agreement to distribute or possess controlled substances: Proven, but the Jury found that Mr. Murray did not possess 5 Kilograms of Cocaine, 280 Grams of Crack, or 1 Kilogram of Heroin. (See Verdict Sheet, Page 3 and 4).

- Mr. Murray's charge of Assault and Attempted Murder in Aid of Racketeering in Count Two: Found Guilty of Assault, and Not Guilty of the more serious allegation of Attempted Murder. (See Verdict Sheet, Page 4). It is also important to note that the evidence at trial did not specifically demonstrate that the victims were shot.

- Mr. Murray's charge of Conspiracy to Distribute Controlled Substances in Count Four: Found Guilty, but the Jury specifically found Mr. Murray to fall within the least culpable categories, to wit: he was responsible for less than 500 grams of cocaine, less than 28 grams of cocaine base, less than 100 grams of heroin, and any quantity of marijuana. (See Verdict Sheet, Page 5 and 7).

In addition to the foregoing, and assuming the Court dismisses Count 5, it is also important for the Court to consider that Mr. Murray is the only defendant who is not facing a mandatory minimum sentence in this case.[2] The fact that Mr. Murray is not facing any mandatory minimum

---

[2] Mr. Johnson and Mr. Green were both convicted of Conspiracy to Distribute at least 5 Kilograms of Cocaine, 280 grams of crack, and 1 Kilogram of Heroin, which invokes a mandatory minimum sentence for both of these defendants. However, the drug weights that were found by the Jury as they relate to Mr. Murray does not invoke a mandatory minimum sentence.

sentencing is a factor that the Court should consider in granting a downward variance for Mr. Murray.

## IV.

### A SENTENCE OF 60-MONTHS' IMPRISONMENT IS APPROPRIATE (18 U.S.C. § 3553(a)(2)).

In this case, the Court must also consider the need for the sentence imposed. 18 U.S.C. § 3553(a)(2). Based on the totality of the circumstances present in this case, coupled with an analysis of each of the pertinent factors set forth in 18 U.S.C. § 3553(a)(2), which are discussed below, the Court should consider that justice is served with a sentence of <u>60-months' imprisonment</u>.

**(1) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.**

In this case, 60-months' imprisonment is sufficient to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. The Court should take this into consideration the arguments above when fashioning an appropriate sentence.

**(2) To afford adequate deterrence to criminal conduct.**

In this case, the sentence requested by the Defense would afford adequate deterrence to criminal conduct. Based on the Defense arguments above, the Court should find that Mr. Murray is a Criminal History Category II. Moreover, he and has never served time in prison. The time that he has been incarcerated thus far in the case is an extraordinarily long time for him since he has never been incarcerated previously. Moreover, the requested sentence will require Mr. Murray to spend additional time in custody. The time requested is sufficient to provide adequate deterrence for Mr. Murray.

Additionally, as discussed above, Mr. Murray's family ties, including the time he will be away from his 8-year old son, his fiancée, and his mother, should be weighted in assessing deterrence, protection of the public, and rehabilitation.

**(3) To protect the public from further crimes of the defendant.**

For the same reasons discussed above, the sentence requested by the Defense would be sufficient to protect the public from further crimes.


**V.**

**A SENTENCE OF 60-MONTHS' IMPRISONMENT IS APPROPRIATE TO AVOID UNNECESSARY SENTENCING DISPARITIES (18 U.S.C. § 3553(a)(2)).**

Although not all of the Co-Defendants have been sentenced in this case, the following Defendants have been sentenced:  Ines Sanches (36 months); Saeed Kaid (58 months); Eric Grayson (60 months); Michael Evans (42 months); Terrel Pinkey (24 months); and Marques Cannon (60 months).

It is important to note the outcomes of the cases of the two non-cooperating defendants. First, Saeed Kaid was not a cooperating witness in this case.  Mr. Kaid was alleged to have been personally involved in a shooting.  His sentence was 58 months' imprisonment.  Second, Eric Grayson was also not a cooperating witness in this case.  It was alleged that he smuggled scalpels into Rikers Island.  His sentence was 72 months' imprisonment.  Both of these defendants were not cooperating witnesses, and both were alleged to have been involved in very serious conduct.

While it is acknowledged that the other sentenced Co-Defendants accepted responsibility and pleaded guilty instead of availing themselves of a trial, the Defense asserts that the Court should not punish Mr. Murray more harshly simply because he chose to have his case decided by a Jury.  While the Defense does not believe that this Court would intentionally sentence Mr. Murray more harshly simply because he availed himself of a trial, statistics show there is generally a substantial difference between the sentence offered prior to trial versus the sentence that a

defendant receives after trial. This penalty is so severe and pervasive in the justice system that it has virtually eliminated the constitutional right to a trial. To avoid the penalty, accused persons must surrender many other fundamental rights which are essential to a fair justice system. In order to address this issue, in July of 2018 the National Association of Criminal Defense Lawyers (NACDL) released a report entitled, "*The Trial Penalty: The Sixth Amendment Right to Trial on the Verge of Extinction and How to Save It*". A copy of the report is attached hereto for the Court's review and consideration. (<u>See</u> Exhibit B).

In order to avoid unnecessary sentencing disparities, and in order to avoid the appearance of a "trial penalty" in this case, the Defense asks the Court to sentence Mr. Murray to 60-months' imprisonment, which is consistent with the sentences of the Co-Defendants, including the non-cooperating Co-Defendants, who have already been sentenced in this case.

## VI.

## <u>CONCLUSION</u>

As set forth in the discussion above, we request that Mr. Murray be sentenced to 60-months' imprisonment. This is the appropriate and just sentence for Mr. Murray. In this case, such a sentence is "sufficient, but not greater than necessary" to satisfy the purposes of sentencing under § 3553(a).

On behalf of Mr. Murray, I thank the Court for taking the time to consider our sentencing submission. We look forward to addressing the Court during the sentencing hearing.

Dated:      New York, NY
              September 1, 2019

                                             Yours, etc.,

                                             /s/ Bryan Konoski

                                            _____

                                             BRYAN KONOSKI
                                           Treyvus & Konoski, P.C.
                                           *Attorney(s) for the Defendant*
                                           305 Broadway, 14th Floor
                                           New York, NY 10007
                                           (212) 897-5832